IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **JESSICA SANDVOSS,** | Case No. 3:17 CV 1784 |
| Plaintiff, | Judge James G. Carr |
| v. | Magistrate Judge James R. Knepp, II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | REPORT AND RECOMMENDATION |

### INTRODUCTION

Plaintiff Jessica Sandvoss ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated August 28, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in December 2013, alleging a disability onset date of July 29, 2013. (Tr. 168). Her claims were denied initially and upon reconsideration. (Tr. 124, 131). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 138). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on May 17, 2016. (Tr. 40-93). On August 3, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 20-33). The Appeals Council denied Plaintiff's request for review, making the hearing decision the

final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely

filed the instant action on August 25, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in February, 1976, which made her 37 years old at the alleged onset date.

(Tr. 32). She graduated from high school in 1995, with a cumulative grade point average of 3.646.

(Tr. 277). She took special education classes. (Tr. 48, 387). She previously worked as a bakery

clerk for four different businesses from 1997 through July 29, 2013. (Tr. 198).

Plaintiff, assisted by her father, completed a Function Report as part of her disability

application. (Tr. 202-16). Plaintiff lived alone with "massive support from her family", according

to the report. (Tr. 202). She cooked nothing more complex than soup or a sandwich, did her own

laundry but relied on her mother to clean the floors, entertained herself with a phone, social media,

and an e-reader, drove, and did her own grocery shopping. (Tr. 203-08).

At the May 17, 2016 ALJ hearing, Plaintiff testified she was easily overwhelmed and blew

up at people. (Tr. 53-54). Her mental issues had remained the same for the last ten-to-fifteen years,

she said. (Tr. 57). She had leukemia when she was two years old, and she said the radiation used

to treat the disease affected her brain, causing the explosive anger. (Tr. 53). She detailed her work

history, which included being fired for pushing a co-worker and quitting her most recent job after

blowing up at a customer. (Tr. 50-53). Plaintiff did not return to work because she developed pain

in her neck and arm, which she said prevented her from writing well or picking up items with her

right hand. (Tr. 54). Plaintiff took over-the-counter medication to treat the pain, and received no

other treatment. (Tr. 55).

2

Plaintiff lived with her parents for the past year, but previously lived alone. (Tr. 46). She handled her own personal care, and assisted her parents with gardening and other household chores. (Tr. 60). She had a driver's license and drove a few times per week. (Tr. 47-48).

Medical Evidence

*Prior to Alleged Onset Date*

Plaintiff began treatment for acute lymphoblastic leukemia in 1977. (Tr. 428-29). She participated in a clinical trial that used systemic chemotherapy and cranial radiation to treat the disease. *Id.* Cranial radiation is now well-recognized as a cause of neurocognitive late effects, especially when used on very young children. *Id.* Plaintiff had an Individualized Education Program in high school. (Tr. 280). Plaintiff had excellent attendance, did "very well" in school, and worked in the summers. (Tr. 281). She was never suspended or expelled from school. (Tr. 387).

In December 1992, Wiley Mavis, a psychologist, through Shawnee Local Schools, administered the Wechsler Intelligence Scale for Children-Third Edition. (Tr. 285-87). Plaintiff scored a Verbal IQ of 67; a Performance IQ of 72; and a Full-Scale IQ of 68. (Tr. 285). Mr. Mavis concluded Plaintiff:

> is regarded as an overall below average intellectually functioning student who exhibits limited knowledge, language organization, concept development, fine motor coordination, and listening comprehension difficulties. She needs oral/visual cuing, especially when linked to life orientation and her experiences. She also requires slow oral delivery and segmentation of information, with her own restating in her own words to insure greater understanding.

(Tr. 287).

He also described Plaintiff as friendly, diligent, very cooperative and mature in her social interaction. (Tr. 285). In eleventh grade, Plaintiff read at an eighth grade level, had reading comprehension skills at a sixth grade level, wrote and did math calculations at a fifth grade level,

3

and performed math reasoning at a third grade level. (Tr. 292). She graduated in 1995 with a 3.646 grade point average. (Tr. 277). Her composite ACT score was 12. *Id.*

*After Alleged Onset Date*

On July 29, 2013, Plaintiff met with Donald Rohl, D.O., an orthopedic surgeon, to address neck and arm pain. (Tr. 379). Dr. Rohl diagnosed a C5-6 herniated disc and right arm radiculopathy. *Id.* Dr. Rohl recommended physical therapy to improve cervical strength and traction, and medication to address the pain. *Id.* He also recommended Plaintiff stay off work for one month during therapy because she was incapable of doing any heavy lifting. *Id.* Plaintiff quit her job that day. (Tr. 185).

On August 21, 2013, Plaintiff met with Ying Chen, D.O., a neurological spinal surgeon, to address the same symptoms. (Tr. 383-85). Plaintiff's neck and arm pain had progressively worsened over the past three-to-four months. (Tr. 383). No specific injury caused the pain, Plaintiff said, but her bakery job required her to lift 50-to-60 pound trays on a routine basis. *Id.* She was not working because of the pain. (Tr. 384). Dr. Chen noted Plaintiff had not responded to conservative treatments, including physical therapy. *Id.* Dr. Chen recommended surgical decompression and stabilization. (Tr. 385).

On August 28, 2013, Plaintiff saw Elise Clark, FNP-BC, to obtain a refill of Lexapro to treat her depression and to complete disability paperwork. (Tr. 363-64). In her treatment note, Ms. Clark indicated Plaintiff could not work due to a ruptured disc and right arm numbness, and that Plaintiff's current health issues were the result of her childhood cancer treatment. (Tr. 363). Plaintiff told Ms. Clark she slept okay, had good interest, appetite, and concentration, okay energy and no suicidal thoughts. (Tr. 365).

Plaintiff had a cervical fusion surgery on September 27, 2013. (Tr. 333-35). On October 9, 2013, Plaintiff saw Dr. Rohl for a follow-up appointment. (Tr. 353). Plaintiff was alert, oriented, and in no acute distress. *Id.* She had intact sensation and full strength in her arms. *Id.* She described her neck pain as a seven out of ten, and her arm pain as a five out of ten. *Id.* X-rays revealed a well-aligned spine. *Id.* Dr. Rohl restricted Plaintiff from lifting more than five pounds. *Id.*

Opinion Evidence

On August 28, 2013, Dr. Krendl and Ms. Clark completed an Attending Physician's Statement for Thrivent Financial. (Tr. 415-16). They opined Plaintiff was permanently unable to work and could not lift more than five pounds due to a herniated disc. (Tr. 416).

On October 30, 2013, Drs. Chen and Rohl completed a Medical Work Release form, which estimated Plaintiff could return to work on March 17, 2014. (Tr. 417).

On January 28, 2014, Plaintiff underwent a consultative psychological evaluation with Michael Wuebker, Ph.D. Plaintiff told Dr. Wuebker she lived alone. On a typical day, she socialized with family and a friend, cared for her cat, prepared simple meals, performed some household chores, shopped by herself, and watched television, read, or did word search puzzles. (Tr. 390-91). During the examination, Plaintiff behaved cooperatively and pleasantly, Dr. Wuebker noted. (Tr. 391). She had a clean and neat appearance with clear and understandable speech delivered in normal tone and pace. (Tr. 389). She had coherent and logical thought content. Id. Her insight and ability to make sound judgements were marginally intact. (Tr. 390). She had adequate auditory comprehension and adequate memory, both recent and remote. (Tr. 389-90). Her mood was depressed. (Tr. 389).

Plaintiff took a WAIS-IV IQ test, scoring a Full-Scale IQ of 68. (Tr. 393). That score, along with background material and her clinical presentation, prompted Dr. Wuebker to diagnose a mild

intellectual disability. *Id.* He opined Plaintiff could understand and apply directions consistent with that disability, though her cognitive issues would impact her ability to maintain attention, concentration, persistence, and pace; and her ability to respond appropriately to supervision, co-workers, and workplace stressors. (Tr. 393-94). Plaintiff preferred to work alone, she told Dr. Wuebker, and she had some difficulties relating to supervisors, co-workers, and customers. (Tr. 387-88).

On May 6, 2016, Dr. Krendl completed a checklist form regarding Plaintiff's mental functioning. (Tr. 420-23). She indicated Plaintiff had marked restrictions in activities of daily living and marked difficulty maintaining social functioning, and that repeated episodes of deterioration or decompensation were present. (Tr. 420). She further opined Plaintiff, due to depression, had marked impairments in:

- the ability to remember locations and work-like procedures,

- the ability to understand and remember short and simple instructions,

- the ability to carry out detailed instructions,

- the ability to sustain an ordinary routine without special supervision,

- the ability to work in coordination with and proximity with others without being distracted by them, and

- the ability to make simple work-related decisions.

(Tr. 421-23). Dr. Krendl also opined Plaintiff had marked to extreme limitations in:

- the ability to act appropriately with the general public

- the ability to travel in unfamiliar places or use public transportation, and

- the ability to set realistic goals or make plans independently of others.

*Id.* Finally, Dr. Krendl opined Plaintiff had extreme limitations in:

6

- the ability to understand and remember detailed instructions,

- the ability to maintain attention and concentration for extended periods,

- the ability to accept instructions and respond appropriately to criticism from supervisors, and

- the ability to respond appropriately to changes in the work setting.

*Id.* Dr. Krendl opined Plaintiff's depression "may be a direct result" of her childhood cancer treatment, "but it is <u>CERTAINLY</u> related indirectly." (Tr. 423) (emphasis in original).

<u>VE Testimony</u>

A vocational expert appeared and testified at the hearing before the ALJ. (Tr. 77-85). The ALJ asked the VE to consider an individual with Plaintiff's age, education, and work experience, who was limited in the way ultimately found by the ALJ's RFC. (Tr. 28). The VE testified such an individual could not perform Plaintiff's past work, but could perform other jobs in the national economy. (Tr. 81).

<u>ALJ Decision</u>

In her August 3, 2016 decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and had not engaged in substantial gainful activity since her alleged onset date of July 29, 2013. (Tr. 25). She had severe impairments, including degenerative disc disease of the cervical spine, intellectual disability, affective disorder, personality disorder with borderline traits, and alcohol use disorder, but these impairments did not meet or medically equal the severity of a listed impairment individually or in combination. *Id.* After consideration of the record, the ALJ concluded Plaintiff had the residual functional capacity to:

> perform light work as defined in 20 CFR 404.1567(b) except that she can occasionally reach overhead with the right upper extremity; frequently handle and

finger with the right upper extremity; occasionally stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. Mentally, she can perform simple, routine and repetitive short-cycle tasks at an average pace; she cannot perform jobs with strict time or production demands; she is able to interact occasionally with co-workers and supervisors on matters limited to the exercise of simple judgment, but jobs should not require interaction with the general public; she is able to adapt to occasional changes in work duties; and new tasks should be explained and demonstrated.

(Tr. 28).

The ALJ then concluded Plaintiff was unable to perform any past relevant work. (Tr. 32). However, considering Plaintiff's age, education, work experience, and RFC, she could perform other jobs that exist in significant numbers in the national economy. *Id.* Therefore, the ALJ concluded Plaintiff was not disabled from her alleged onset date of July 29, 2013, through the date of her decision. (Tr. 33).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

9

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ erred in two ways. First, Plaintiff argues her intellectual disability satisfies Listing 12.05(C), contrary to the ALJ's conclusion. (Doc. 10, at 6). Second, Plaintiff argues her treating physician, Dr. Krendl, deserved more weight than the ALJ assigned to her opinion. *Id.* at 12. The Commissioner contends the Plaintiff did not satisfy the criteria for Listing 12.05(C), and that the ALJ properly found Dr. Krendl's opinion inconsistent with the medical evidence as a whole. (Doc. 11, at 8, 15). For the following reasons, the undersigned recommends the decision be affirmed.

Listing 12.05(C)

Plaintiff argues the ALJ erred by finding her intellectual disability did not satisfy the diagnostic description of Listing 12.05(C). (Doc. 10, at 6-11). Specifically, she argues the record supports her claim that she had deficits in adaptive functioning which manifested during the developmental period. *Id.* The Commissioner argues Plaintiff's work history and daily activities show she has high adaptive functioning skills that preclude her impairments from satisfying the listing criteria. (Doc. 11, at 8-15).

The listings streamline the disability decision-making process by identifying people whose impairments are more severe than the statutory disability standard, preventing them from performing *any* gainful activity—not just substantial gainful activity—regardless of age, education, or work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); SSR 83-19, at 90). The listings create a presumption of disability making further inquiry unnecessary. *Id.* Each listing establishes specific medical criteria, which a claimant must

10

prove her impairment satisfies to qualify for benefits under a listing. 20 C.F.R. § 404.1525(d); *see also Zebley*, 493 U.S. at 530. It is Plaintiff's burden to establish she meets or equals a listing. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> Listing 12.05, which defines intellectual disability, provides:
>
> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05.[1] Plaintiff's argument focuses on the requirements in Paragraph C:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05(C). In other words, a claimant must make three showings to satisfy Listing 12.05(C): "(1) she experiences 'significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the developmental period' (i.e., the diagnostic description); (2) she has a 'valid verbal, performance, or full scale IQ of 60 through 70'; and (3) she suffers from 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.'" *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 697 (6th Cir. 2007) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C); citing *Foster* 279 F.3d at 354-55).

---

1. The Social Security Administration issued new regulations in September 2016, which took effect in January 2017, for the mental listings. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016). The ALJ issued her decision in August 2016, and thus properly based her findings on the prior version of Listing 12.05.

The ALJ found Plaintiff did not have an impairment that met Listing 12.05.

> [T]he "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function *with deficits in adaptive functioning manifesting in the developmental period*. As provided in Listing 12.00A, "we will find that you have a listed impairment *if the diagnostic description in the introductory paragraph and* the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied." While the claimant has IQ testing that meets this criteria at first glance, the record fails to demonstrate significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period or before age 22 (Exhibits 9F & 17F). Quite to the contrary, the claimant's adaptive functioning abilities far exceed her IQ scores. For example, although the claimant received special education services, she was able to successfully graduate from high school with below average but passing grades (Exhibit 9F, page 2). The claimant's work history is more impressive and demonstrative of high adaptive functioning skills. The claimant has worked in excess of substantial gainful activity levels for 11 years since 1999 in semi-skilled and unskilled occupations such as a bakery helper, cleaner and demonstrator (Exhibits 3E & 4D). The claimant stopped working in 2013 primarily due to neck pain instead of an inability to understand, remember and carry out tasks (Exhibit 9F, page 2). Besides an impressive work history, the claimant lives alone and independently. The claimant's parents help, but reside in Florida throughout most of the year (Exhibit 9F, page 5). Lastly, the claimant is able to drive an automobile, use a computer, manage a checkbook, care for pets and do household chores such as preparing meals, cleaning and laundry (Exhibits 4E & 9F).

(Tr. 27-28) (emphasis in original).

The ALJ highlights several pieces of evidence in support of finding Plaintiff's adaptive skills prevent her impairment from reaching the listing's severity. *See* Tr. 28. She graduated high school, worked for eleven years after high school, lives independently, and is capable of many of life's regular tasks. *Id.* (citing Tr. 198, 387, 390-91). Plaintiff argues this misstates the record by overlooking the low IQ score from high school and a poor academic record, and that the ALJ misreads Plaintiff's work history. (Doc. 10, at 8-12).

Listing 12.05 does not define "adaptive functioning". The Sixth Circuit has held the adaptive skills prong specifically evaluates social skills, communication skills, and daily living

12

skills. *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) (citing *Heller v. Doe*, 509 U.S. 312, 329 (1993)). More particular definitions for adaptive functioning can be found elsewhere in the listings. *See Kent v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 643, 648-49 (S.D. Ohio 2015) ("Although Listing § 12.05 does not define 'adaptive functioning,' another portion of the listings defines 'adaptive activities' as 'cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.'") (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(1)). In the listed description of an episode of decompensation, a loss of adaptive functioning means "difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00(C)(4). Scholastic success and a history of semi-skilled work have precluded finding the necessary adaptive functioning deficit to satisfy the listing. *Mutalemwa v. Comm'r of Soc. Sec.*, 2014 WL 4104127 at *13, n.6 (N.D. Ohio) (citing *Watson v. Barnhart*, 2006 WL 2945228 at *1 (E.D. Pa.) (Plaintiff who had history of semi-skilled work and independent living did not have required deficit in adaptive functioning to satisfy the listing)).

Plaintiff first turns to the IQ test administered by Mr. Mavis while she was in high school. She had below-grade-level reading, writing, and math skills, according to Mr. Mavis, including third-grade math reasoning skills when Plaintiff was in the tenth grade. (Tr. 285). Additionally, Mr. Mavis found Plaintiff had a full-scale IQ of 68, sufficiently low to allow Plaintiff to meet one listing criterion. *Id.* The ALJ, in her analysis, acknowledged the testing, and found it satisfied a portion of the listing. (Tr. 27-28) ("While the claimant has IQ testing that meets this criteria at first glance, the record fails to demonstrate significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period or before

age 22".) However, an IQ score does not inform the ALJ about adaptive functioning abilities. (Tr. 28) ("[T]he claimant's adaptive functioning abilities far exceed her IQ scores."). Satisfying the listing requires both an IQ score between 60 and 70, *and* an impairment with deficits in adaptive functioning. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.05; *see also West*, 240 F. App'x at 697. Referring to an IQ test from the relevant time period does not advance Plaintiff's argument regarding adaptive functioning, as the ALJ already acknowledged the low IQ score. A deficit in adaptive functioning is a distinct element to prove, which Plaintiff did not do.

The record further supports the ALJ's conclusion that Plaintiff did not have deficits in adaptive functioning, and thus did not meet the Listing's diagnostic description. The ALJ noted Plaintiff graduated from high school. (Tr. 28). Despite Mr. Mavis's bleak assessment of Plaintiff's abilities, she graduated with a 3.646 grade point average. (Tr. 277). She testified she spent minimal time in special education classes. (Tr. 48-50). Even with low scores on standardized tests (Tr. 277), Plaintiff's academic record offers substantial evidence to support the ALJ's conclusion. (Tr. 30, 277). *See Mutalemwa,* 2014 WL 4104127 at *13 (obtaining a GED on claimant's third try and passing a written driving test is indicative of sufficient adaptive functioning, despite special education classes).

Additionally, Plaintiff's work history supports the ALJ's conclusion regarding adaptive functioning. This is so even though Plaintiff argues the ALJ misconstrued her work history by failing to recognize how she struggled to maintain a job and meet her employers' expectations. The ALJ found Plaintiff worked in excess of substantial gainful activity levels for eleven years, ending at her alleged onset date. (Tr. 31). This is supported by the record—Plaintiff worked in unskilled and semi-skilled positions for three employers in that time span. (Tr. 79-80, 198). This work history is sufficient to preclude the ALJ from finding a level of adaptive functioning

deficiency that would satisfy the listing. *See Joyce v. Comm'r of Soc. Sec.*, 662 F. App'x 430, 434 (6th Cir. 2016) (Plaintiff's semi-skilled work history, along with his ability to pay bills, grocery shop, cook, and interact with family undermine claims of adaptive functioning deficits). Plaintiff's most recent job lasted seven years, calling into question the soundness of Plaintiff's argument that she could not hold a job. (Tr. 198). *See Justice v. Comm'r of Soc. Sec.*, 505 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ's findings provide substantial evidence for the conclusion that [Plaintiff] did not display a deficit in adaptive functioning initially manifested during the developmental period… [Plaintiff] has a lengthy work history, including a variety of semiskilled and unskilled positions.").

As the ALJ pointed out, Plaintiff has a lengthy work history which began in and extended past the end of the relevant developmental period. Along with the dearth of evidence in Plaintiff's school record, these two reasons undermine Plaintiff's arguments regarding allegedly deficient adaptive functioning, a necessary component of satisfying Listing 12.05. 20 C.F.R. § 404.1525(d); *see also Zebley*, 493 U.S. at 530. Plaintiff has the burden of proving her impairment meets a listing, a burden she has not met. *See Foster,* 279 F.3d at 354. The ALJ's finding is supported by substantial evidence, therefore the undersigned recommends this portion of the decision be affirmed.

Treating Physician

Next, Plaintiff argues the ALJ failed to properly consider the opinion of treating physician Dr. Krendl. (Doc. 10, at 12). Specifically, Plaintiff argues the ALJ erred by finding Dr. Krendl's opinions inconsistent with two different mental health evaluations in the record, and improperly addressing Plaintiff's work history and lack of mental health treatment. *Id.* at 12-16. The Commissioner argues the ALJ properly discounted Dr. Krendl's opinion, because it was

inconsistent with the record. (Doc. 11, at 15-22). For the following reasons, the undersigned recommends the decision be affirmed.

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*. While an ALJ is required to delineate good reasons, she is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons . . . for the weight . . . give[n] [to the] treating source's opinion"— not an exhaustive factor-by-factor analysis." (quoting 20 C.F.R. § 404.1527(d)(2))).

16

Dr. Krendl has been Plaintiff's physician for more than 15 years. (Tr. 420). Neither party disputes her status as a treating physician. As such, her opinions are entitled to controlling weight unless the ALJ finds her opinion inconsistent with the record as a whole or unsupported by clinical and laboratory diagnostic techniques. *Wilson*, 378 F.3d at 544.

The ALJ considered two opinion statements from Dr. Krendl. In the first, Dr. Krendl (and Ms. Clark) opined Plaintiff could never return to work and could not perform any other occupation due to a ruptured disc[2]. (Tr. 416). In her second, Dr. Krendl completed a checklist of mental limitations and opined Plaintiff's was at least markedly limited in many areas of mental functioning. (Tr. 420-23). The ALJ explained her evaluation of these opinions, and the weight assigned as follows:

> I give little weight to the opinions of Dr. Krendal [sic], the claimant's treating family physician, who opined that the claimant is permanently unable to work and unable to lift more than five pounds (Exhibits 15F & 18F). Dr. Krendal's opinion is inconsistent with post-surgery imaging, physical examination findings that are generally normal except for slightly reduced strength in the right upper extremity and the claimant's activities of daily living, which include regular household chores such as cooking and cleaning (Exhibits 4E, 9F, l0F, 11F, 12F & 14F). Dr. Krendal's opinion about the claimant's markedly impaired mental functioning and GAF of 50 is inconsistent with mental status examination findings from Ms. Clark, a nurse practitioner in Dr. Krendal's practice, Dr. Wuebker's thorough mental status evaluation, claimant's lack of mental health treatment, her work history, and her extensive activities of daily living, which include socializing with family and a friend (Exhibits 4E, 7F & 9F).

(Tr. 31).

The ALJ found Dr. Krendl's mental limitation opinion inconsistent with other substantial evidence in the record, satisfying the requirement imposed on the ALJ by the "good reasons" rule.

---

2. Dr. Krendl offered opinions on Plaintiff's physical and mental impairments. Plaintiff's arguments deal exclusively with Dr. Krendl's mental health opinions, therefore the undersigned will not review the ALJ's decision regarding Plaintiff's physical impairments. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

*Wilson*, 378 F.3d at 544. In support, the ALJ cited Dr. Wuebker's opinion, mental status examinations from Ms. Clark, Plaintiff's lack of mental health treatment, her work history, and her daily living activities as substantial evidence contrary to the restrictions provided by Dr. Krendl. Together, the record evidence paints a less restrictive portrait of Plaintiff's abilities than the opinion provided by Dr. Krendl. Accordingly—as detailed further below—the undersigned recommends the ALJ's decision be affirmed, as it is supported by substantial evidence.

Dr. Krendl's opinion statement assigns several extreme and marked limitations as a result of Plaintiff's depression, the existence of which she attributes to Plaintiff's childhood cancer treatment. *See* Tr. 420-423 ("[Plaintiff's] depression <u>may</u> be a direct result of her brain radiation in early childhood, but it is <u>CERTAINLY</u> related indirectly" (emphasis in original)). To the contrary, Dr. Wuebker found Plaintiff had only a slightly depressed mood (Tr. 389) though he did indicate Plaintiff likely met the criteria for depression (Tr. 393). Plaintiff argues the two opinions cannot be compared, because the checkbox form completed by Dr. Krendl offers more specific limitations than Dr. Wuebker. However, Dr. Wuebker's examination provides evidence that Dr. Krendl's opinion is inconsistent with Plaintiff's actual abilities by not finding the sort of objective symptoms that would prompt such restrictive opinions. *See Gault v. Comm'r of Soc. Sec.*, 535 F. App'x 495, 496 (6th Cir. 2013) ("[H]e explicitly rejected the conclusion that [Plaintiff] had marked mental limitations on the basis that it conflicted with her benign clinical examinations, conservative course of treatment, and daily activities."); *Shells v. Colvin,* 2016 WL 3027062 at *4 (N.D. Ohio) (mental status examinations which indicated few abnormalities support an ALJ finding the treating physician's opinion inconsistent with the evidence); *Taylor v. Colvin,* 2016 WL 760399, at *12 (N.D. Ohio) (normal or mild findings on mental status examinations support discounting a treating physician's opinion, which included severe limitations). While

18

administering an IQ test, Dr. Wuebker found Plaintiff to be pleasant and cooperative. (Tr. 391). Dr. Krendl, on the other hand, opined Plaintiff had marked limitations in social interactions, and extreme limitations in accepting instructions. (Tr. 422). She arrived to the appointment with Dr. Wuebker punctually, though Dr. Krendl opined Plaintiff is moderately impaired in her ability to perform activities within a schedule. (Tr. 386, 421). Dr. Wuebker also noted attendance was not an issue for Plaintiff in high school, which is when Plaintiff said her depression began. (Tr. 387-88). Accordingly, the undersigned finds the ALJ did not err in finding Dr. Krendl inconsistent with Dr. Wuebker.

Similarly, Plaintiff told Ms. Clark she slept okay, had good interest, appetite, and concentration, okay energy and no suicidal thoughts. (Tr. 365). Largely normal or mild findings on mental status examinations can support finding a treating physician's opinion inconsistent with the record evidence. *See Gault,* 535 F. App'x at 496. The normal or mild status evaluations recorded by Ms. Clark provide support for the ALJ's decision to discount Dr. Krendl's opinion, as it is inconsistent with the record evidence.

Additionally, the ALJ found Plaintiff's lack of recorded mental health treatment supported her discounting of Dr. Krendl's opinion. Plaintiff cites to Sixth Circuit precedent to support her claim that a lack of mental health treatment cannot be cited as support for less limiting mental health issues. (Doc. 10, at 15) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some disorders, the very failure to seek treatment is simply another symptom of the disorder itself")). Following a citation, the next sentence in the Sixth Circuit's decision in *White* reads, "But in this case there is no evidence in the record explaining [Plaintiff's] failure to seek treatment during this half-year gap. A 'reasonable mind' might therefore find that the lack of treatment during the pre-November 4, 2002 time frame indicated an alleviation of [Plaintiff's]

symptoms." *Id.* at 283-84. For *White* to apply, Plaintiff must present some evidence showing how her depression prevents her from seeking treatment. *See Smith v. Astrue*, 2012 WL 6607007 at *5 (N.D. Ohio) (holding *White* did not create a *per se* rule that the existence of a mental impairment excuses non-compliance); *Burge v. Comm'r of Soc. Sec.*, 2013 WL 6837192 at *3 (N.D. Ohio) ("Accordingly, to establish a severe mental impairment as an acceptable reason excusing a claimant's adherence to a medical regimen including prescription psychiatric medications, the record must contain evidence expressly linking noncompliance with the severe mental impairment."). Plaintiff has not provided any explanation for the minimal treatment of her depression, nor has she provided evidence to show her depression prevented her from seeking treatment. While her intellectual disabilities may be unlikely to improve as Plaintiff asserts, depression is the cause offered by Dr. Krendl for Plaintiff's myriad workplace restrictions, and Plaintiff has not sought intensive ongoing treatment for her depression, as would be expected if her depression was as limiting as Dr. Krendl opined. (Tr. 423). Accordingly, the ALJ did not err in using Plaintiff's lack of mental health treatment to show inconsistency between the record and Dr. Krendl's opinion.

The ALJ also cited Plaintiff's work history and activities of daily living as evidence inconsistent with Dr. Krendl's restrictive opinion. Plaintiff offers no evidence to show her depressive symptoms were worsening. Dr. Krendl attributes Plaintiff's depression, either directly or indirectly, to Plaintiff's childhood cancer treatment. *Id.* However, Plaintiff told Dr. Wuebker her depression began in high school. (Tr. 388). She also reported anti-depressant medication, which she had taken since 2000 or 2001, helped her symptoms. (Tr. 389). Taken together, the record shows Plaintiff was suffering from depression while engaged in substantial gainful activity. (Tr. 177-78, 198) (Plaintiff worked continuously from 1997 through July 29, 2013, and earned

enough money to qualify as substantial gainful activity). Dr. Krendl offered severely restrictive opinions based on Plaintiff's depression, despite Plaintiff's unexplained lack of treatment, lack of evidence indicating worsening symptoms, and a history of the disorder which stretches well into Plaintiff's lengthy work history. Additionally, Plaintiff's alleged onset date corresponds with neck and arm pain treated through surgery, not with worsening mental health symptoms. (Tr. 185). "A condition that plaintiff had while she was still working detracts from a claim of disability later when she seeks benefits." *Smith v. Colvin*, 2016 WL 1055895 at *6 (E.D. Tenn.) (citing *Bowen v. Comm'r of Soc. Sec.*, 581 F. App'x 544, 545 (6th Cir. 2014)). Without credible medical evidence demonstrating additional limitations stemming from her depression, the ALJ correctly discounted Dr. Krendl's opinion, as the depression she relied on in severely limiting Plaintiff's workplace abilities did not prevent her from engaging in years of substantial gainful activity.

Finally, Plaintiff's daily activities indicate a level of independence and social skills that undermine Dr. Krendl's restrictive opinions, which included marked limitations in Plaintiff's activities of daily living. (Tr. 420). Plaintiff lived alone, with support from her family. (Tr. 46, 202). She regularly prepared simple meals and accomplished other household chores. (Tr. 203). Dr. Krendl opined Plaintiff had marked limitations in social interactions (Tr. 420), in contrast to evidence that she maintains a friendship, spends time on Facebook, and interacts regularly with her family (Tr. 204).

Taken together, the ALJ provided good reasons for discounting Plaintiff's treating physician. Her opinion is inconsistent with other medical evidence and opinion evidence, which casts doubt on the severity of Dr. Krendl's opinion. Her opinion is inconsistent with her work history, which overlaps almost entirely with her minimal treatment for depression. For the abovementioned reasons, the undersigned recommends affirming the ALJ's decision.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported and recommends the decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).